**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>MEK GLOBAL LIMITED, PHOENIXFIN PTE. LTD., FLASHDOT LIMITED, and PEKEN GLOBAL LIMITED (collectively d/b/a "KUCOIN"),<br><br>　　　　　　　　Defendants. | Civil Action No. 24-cv-2255<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**<br><br>**JURY TRIAL DEMANDED** |

## I.　　SUMMARY

1.　　From at least July 2019 and continuing to at least June 2023 (the "Relevant Period"), Defendants Mek Global Limited, PhoenixFin PTE Ltd., Flashdot Limited (f/k/a PhoenixFin Limited), and Peken Global Limited, collectively doing business as a centralized digital asset exchange under the name "KuCoin," repeatedly and continuously violated the Commodity Exchange Act ("CEA" or "Act") and regulations ("Regulations") promulgated by the Commodity Futures Trading Commission ("CFTC" or "Commission") by, among other things, illegally dealing in off-exchange commodity futures transactions and leveraged, margined, or financed retail commodity transactions; soliciting and accepting orders for commodity futures, swaps, and leveraged, margined, or financed retail commodity transactions without registering with the Commission as a Futures Commission Merchant ("FCM"); failing to diligently supervise its FCM activities; operating a facility for the trading or processing of swaps without registering with the Commission as a swap execution facility ("SEF") or designated

contract market ("DCM"); and failing to implement an effective customer identification program ("CIP").

2.      Billing itself as the "People's Exchange," KuCoin is a centralized digital asset exchange headquartered in the Republic of Seychelles, the Cayman Islands, and Singapore, with 27 million customers across 200 countries, including the United States, and a cumulative trading volume of $3.6 trillion in 2022.  During the Relevant Period, KuCoin solicited and accepted orders, accepted property to margin, and operated a facility for the trading of futures, swaps, and leveraged, margined, or financed retail transactions involving digital assets that are commodities including bitcoin (BTC), ether (ETH), and litecoin (LTC).  During the Relevant Period, between 20% and 50% of KuCoin's customers were based in the United States according to KuCoin's own promotional material.  These actions brought KuCoin squarely within the CFTC's authority and required that KuCoin register with the CFTC and comply with all applicable regulations.

3.      Yet despite KuCoin's solicitation of U.S. persons, KuCoin has never been registered with the CFTC in any capacity and disregarded numerous federal laws essential to the integrity and vitality of the U.S. financial markets, including laws that require the implementation of controls designed to prevent and detect money laundering and terrorism financing—such as know-your-customer ("KYC") verification procedures—in violation of the CEA, 7 U.S.C. §§ 1–26, and Regulations, 17 C.F.R. pts. 1–190 (2022).

4.      KuCoin obscured its solicitation of U.S. persons by implementing half-measures that provided, at best, a fig leaf of compliance with applicable U.S. laws and regulations.  For instance, at times during the Relevant Period, KuCoin's "Terms of Use" stated that residents of "Restricted Locations" such as the United States could not use the KuCoin platform; but KuCoin

did not implement any mandatory measures to verify the location or residence of its customers or to restrict U.S. customers from accessing and trading commodity derivatives on its platform.

5.      Although KuCoin purported to implement KYC procedures on or around November 1, 2018, those procedures were a sham and did not actually prevent U.S. customers from trading commodity interests and other derivatives on the platform.  Instead, KuCoin's KYC procedures were *completely optional* during the Relevant Period, and KuCoin encouraged U.S. customers to avoid them.  Accordingly, anyone—including scammers, fraudsters, and money launderers as well as innocent U.S. retail customers—could continue to use the platform simply by declining to submit to the KYC verification process.

6.      Furthermore, although U.S. customers that submitted KYC information were subject to certain trading restrictions, they were not prohibited from trading commodity derivatives altogether.  Thus, even after receiving KYC information identifying individuals as U.S. customers, KuCoin continued to allow those customers to engage in trading of futures, swaps, and leveraged, margined, or financed retail commodity transactions in violation of the Act and Regulations.

7.      KuCoin engaged in marketing activities designed to attract U.S. customers and sponsored internet content that promoted KuCoin's sham KYC requirements as a benefit to U.S. customers.  KuCoin paid internet influencers to peddle misleading half-truths—for example, characterizing the ability to trade on KuCoin from the United States as a "gray area," when it was clear that it was illegal for KuCoin to deal in swaps, futures, and leveraged, margined, or financed retail transactions involving commodities in the United States.

8.      As a result, throughout the Relevant Period, Defendants, acting as a common enterprise, violated core provisions of the CEA and Regulations, including:

i.  offering, entering into, confirming the execution of, or otherwise dealing in, off-exchange commodity futures transactions or transactions described in Section 2(c)(2)(D) of the Act, in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a), or, alternatively, Section 4(b), 7 U.S.C. § 4(b) and Regulation 48.3, 17 C.F.R. § 48.3 (2023);

ii.  soliciting and accepting orders for commodity futures, swaps, and retail commodity transactions or acting as a counterparty in any agreement, contract, or transaction described in Section 2(c)(2)(D)(i) of the Act; and, in connection with these activities, accepting money, securities or property (or extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on KuCoin, without registering as an FCM, in violation of Section 4d of the Act, 7 U.S.C. § 6d;

iii.  operating a facility for the trading or processing of swaps without being registered as a SEF or DCM, in violation of Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2022);

iv.  failing to diligently supervise KuCoin's activities relating to the conduct that subjects KuCoin to Commission registration requirements, in violation of Regulation 166.3, 17 C.F.R. § 166.3 (2022); and

v.  failing to implement an effective customer identification program and to otherwise comply with applicable provisions of the Bank Secrecy Act, in violation of Regulation 42.2, 17 C.F.R. § 42.2 (2022).

9.  Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

10.  Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-l, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c of the CEA, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

12.     Venue properly lies with this Court pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e), because Defendants transacted business in the Southern District of New York, and Defendants engaged in acts and practices in violation of the CEA and Regulations within this District.

## III.     PARTIES

### A.     The CFTC

13.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Regulations promulgated thereunder.

### B.     Defendants

14.     **Mek Global Limited ("Mek Global")** is incorporated under the laws of the Republic of Seychelles. Throughout the Relevant Period, KuCoin operated under the legal name Mek Global Limited. Mek Global has never been designated or registered with the Commission in any capacity.

15.     **PhoenixFin Pte Ltd ("PhoenixFin")** is incorporated under the laws of Singapore. Throughout the Relevant Period, Phoenixfin was the owner of the "kucoin.com"

domain.  Phoenixfin has never been designated or registered with the Commission in any capacity.

16.    **Flashdot Limited ("Flashdot")**, formerly known as PhoenixFin Limited, is a company incorporated in the Cayman Islands and is the holding company of the cryptocurrency exchange commonly known as KuCoin.  Neither Flashdot nor PhoenixFin Limited have been designated or registered with the Commission in any capacity.

17.    **Peken Global Limited ("Peken")** is incorporated under the laws of the Republic of Seychelles.  Peken is a related entity to Mek Global and involved in the operations of KuCoin, including KuCoin Labs, which is KuCoin's primary market investment and research group. Peken has never been designated or registered with the Commission in any capacity.

18.    Mek Global, PhoenixFin, Flashdot, and Peken act as a single, integrated common enterprise, which has never been registered with the Commission.  They share the same founding team, management team, and operational team.  They advertise on a single website that does not distinguish between entities.  Each of the entities represents a "product line" rather than an independent business.  Employees of the various entities have "@kucoin.com" email addresses. These entities operate as an integrated, common enterprise, and are described together in this complaint as "KuCoin."

## IV.    STATUTORY BACKGROUND AND LEGAL FRAMEWORK

A.    **To Protect Members of the Public, Leveraged, Margined, or Financed Retail Commodity Transactions and Futures Must Be Offered on a Regulated Exchange, and No Person May Operate a Facility for the Trading or Processing of Swaps Unless the Facility Is Registered with the CFTC**

19.    The purpose of the Act is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5.

20.    A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights.  Digital assets include virtual currencies that are digital representations of value that function as mediums of exchange, units of account, and/or stores of value.  Many digital assets, including BTC, ETH, LTC, and stablecoins like USDC and USDT, are "commodities" in interstate commerce as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).  In recent years, as digital asset markets have evolved, futures contracts have been offered on certain digital assets by boards of trade that are registered with the CFTC, such as the Chicago Mercantile Exchange and Chicago Board Options Exchange.

21.    Derivatives are financial instruments such as futures, options, or swaps that derive their value from something else, including, for example, a benchmark rate, a physical commodity such as oil or wheat, or a digital asset commodity.  The CEA requires that, subject to certain

exemptions and as described further below, commodity derivative transactions must be conducted on exchanges designated by, or registered with, the CFTC.

22.     A contract of sale of a commodity for future delivery, or commodity futures contract, is a fungible promise to buy or sell a particular commodity, like BTC, ETH, or LTC, at a fixed date in the future.  Trading of commodity futures contracts must be conducted on a board of trade designated by the CFTC as a contract market (i.e., a DCM).  7 U.S.C. § 6.  The criteria, procedures, and requirements for designation as a DCM are set forth in Section 5 of the Act, 7 U.S.C. § 7, and Part 38 of the Regulations, 17 C.F.R. Part 38.  In the case of a foreign board of trade that provides participants in the U.S. with direct access to its electronic trading and order matching system, the foreign board of trade must register with the Commission.  7 U.S.C. § 6; 17 C.F.R. § 48.3 (2022).

23.     Leveraged, margined, or financed retail commodity transactions as the term is used here are transactions that are entered into with, or offered to, non-eligible contract participants[1] "on a leveraged, margined, or financed basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis" and which do not result in actual delivery of the underlying commodity within 28 days.  7 U.S.C. § 2(c)(2)(D)(i), (ii)(III)(aa).  Leveraged, margined, and financed retail commodity transactions are subject to 7 U.S.C. § 6(a) "as if" they are a contract of sale of a commodity for future delivery and therefore must be executed on a regulated exchange.  7 U.S.C. § 2(c)(2)(D)(iii).

---

[1] An eligible contract participant ("ECP") is, in general, an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10 million, or $5 million if the individual enters into the transaction "in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual."  Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi).

24.     Swaps are another type of derivative, which under Section 1a(47)(A)(iii), (iv), and

(vi) of the Act, 7 U.S.C. § 1a(47)(A)(iii), (iv), (vi), are broadly defined to include "any

agreement, contract, or transaction"—

> (iii) [T]hat provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interest or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract or transaction commonly known as . . . (I) an interest rate swap; . . . (VII) a currency swap; . . . [or] (XXII) a commodity swap . . . ;

> (iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap; [or]

> (vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of [these clauses].

25.     With limited exceptions, Section 5h(a) of the Act, 7 U.S.C. § 7b-3, and

Regulation 37.3, 17 C.F.R. § 37.3 (2022), make it illegal for a person to operate a facility for the

trading or processing of swaps unless the facility is registered with the CFTC as a SEF or DCM.

SEFs are defined under Section 1a(50) to mean a trading system or platform in which multiple

participants have the ability to execute or trade swaps by accepting bids and offers made by

multiple participants in the facility or system, through any means of interstate commerce,

including any trading facility that:  (A) facilitates the execution of swaps between persons; and

(B) is not a DCM.

26.     The provisions of the Act and Regulations that apply to DCMs and SEFs, which

are the facilities where the trading of commodity derivatives typically occurs, establish important

protections for U.S. derivatives markets and market participants, including retail customers.  For example, DCMs and SEFs must:

(a) conform to core principles that are designed to prevent market abuse, Sections 5(d)(12)(a) and 5h(f)(2)(B) of the Act, 7 U.S.C. §§ 7(d)(12)(a), 7b-3(f)(2)(B);

(b) ensure their financial stability, Sections 5(d)(21) and 5h(f)(13) of the Act, 7 U.S.C. §§ 7(d)(21), 7b-3(f)(13);

(c) protect their information security, Regulations 38.1051(a)(2) and 37.1401(a)(2), 17 C.F.R. §§ 38.1051(a)(2), 37.1401(a)(2) (2022); and

(d) safeguard their systems against operational risk, Sections 5(d)(20) and 5h(f)(14) of the Act, 7 U.S.C. §§ 7(d)(20), 7b-3(f)(14).

27.    When entities offer retail commodity transactions (and other transactions that are required to be executed on a regulated exchange) outside of a regulated exchange, and without adherence to the core principles with which regulated exchanges must comply, they place members of the public at significant risk of harm.

**B.    To Protect Members of the Public, Only Registered FCMs May Solicit or Accept Orders for and Accept Funds to Margin, Retail Commodity Transactions and Swaps or Futures Involving Commodities.**

28.    An FCM is an individual, association, partnership, corporation, or trust that is (i) engaged in soliciting or in accepting orders for regulated transactions including futures, swaps, commodity options, or retail commodity transactions, or (ii) acts as a counterparty to retail commodity transactions; and which, in connection with these activities, "accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom."  Section la(28)(A) of the Act, 7 U.S.C. § la(28)(A).

29.    FCMs hold customer funds to margin commodity derivative transactions.  In this intermediary role, FCMs are a critical component of the U.S. financial system and must meet stringent requirements imposed by the Act and Regulations.  Among the most fundamental of

these requirements is Section 4d(a) of the Act, 7 U.S.C. § 6d(a), which makes it illegal for any person to act as an FCM unless registered as such with the Commission.

30.     The requirement that only registered FCMs may solicit or accept orders for, and accept funds to margin, futures, swaps, or retail commodity transactions is necessary to ensure vital protections for United States derivatives markets and market participants.  For example, FCMs must segregate customer assets to protect them from the risk of the FCM's insolvency, 7 U.S.C. § 6d(a)(2); establish safeguards to prevent conflicts of interest, 7 U.S.C. § 6d(c); and employ only salespeople who register with the CFTC and meet strict proficiency requirements, 7 U.S.C. § 6k(1).

31.     When entities solicit and accept orders for and accept funds to margin futures, swaps, or retail commodity transactions without registering as an FCM and without adhering to the customer-protection requirements with which FCMs must comply, they place members of the public at significant risk of harm.

**C.     To Prevent Money Laundering and Transactions by Prohibited Persons, FCMs Must Adopt Customer Identification Programs to Verify the Identifies of Their Customers.**

32.     Regulation 42.2, 17 C.F.R. § 42.2 (2022), requires, among other things, that every FCM shall comply with the applicable provisions of the Bank Secrecy Act ("BSA") and the regulations promulgated by the Department of the Treasury under the BSA at 31 C.F.R. chapter X (2022), and with the requirements of 31 U.S.C. § 5318(l) and the implementing regulation jointly promulgated by the Commission and the Department of the Treasury at 31 C.F.R. § 1026.220 (2022), which require that a customer identification program ("CIP") be adopted as part of the firm's BSA compliance program.

33.     31 U.S.C. § 5318(l) requires, among other things, that financial institutions such as FCMs implement reasonable KYC procedures to verify the identity of any person seeking to

open an account, maintain records of information used to verify a person's identity, and consult

lists of known or suspected terrorists or terrorist organizations (such as those created and

distributed by the Office of Foreign Asset Control of the United States Department of Treasury

("OFAC")) to determine whether a person seeking to open an account appears on any such list.

34.     The regulations promulgated by the Department of Treasury under 31 C.F.R.

chapter X require, as relevant here, that every FCM must:  (1) implement a written CIP that, at a

minimum, includes procedures for verifying the identity of each customer sufficient to enable the

FCM to form a reasonable belief that it knows the true identity of each customer; (2) retain

records collected pursuant to the CIP; and (3) implement procedures for determining whether a

customer appears on any list of known or suspected terrorists or terrorist organizations.

35.     Regulation 166.3, 17 C.F.R. § 166.3 (2022), requires a Commission registrant

such as an FCM to diligently supervise all activities of its officers, employees, and agents

relating to its business as an FCM.  The term "Commission registrant" as used in 17 C.F.R.

§ 166.3 means "any person who is registered or required to be registered with the Commission

pursuant to the Act or any rule, regulation, or order thereunder."  17 C.F.R. § 166.1(a).

## V.    FACTS

**A.    The KuCoin Exchange and Products**

36.     KuCoin is a global cryptocurrency exchange putatively headquartered in the

Republic of Seychelles.  It offers trading in over 700 digital asset products (encompassing both

spot and derivative markets) and boasts 27 million customers in over 200 countries, with a

transaction volume in excess of $3.6 trillion in 2022.  Trading on KuCoin may be accomplished

either through its website, which was accessible to U.S. customers during the Relevant Period, or

through a downloadable application, which was available to download on Apple, Google, and Android mobile devices in the U.S. during the Relevant Period.

37.     KuCoin maintained an active presence on U.S.-based social media platforms during the Relevant Period and solicited U.S. persons through its social media accounts.  For example, KuCoin maintained a Twitter (now "X") account with thousands of U.S.-based followers and served as moderator of the r/kucoin forum on Reddit.  On both Twitter and Reddit, KuCoin frequently posted updates in English (including updates about leveraged trading and trading of futures and swaps) and responded to questions posted by U.S.-based accounts.

38.     The trading of digital asset commodity derivatives is a core feature of KuCoin, and the exchange allows trading of a wide variety of such products, including "quarterly delivery futures," "perpetual futures," "leveraged tokens," and leveraged, margined, or financed trading of digital asset commodities.

39.     According to KuCoin, over 24.8 million customers—over 90% of its total customer base—have traded some form of "futures" on the platform, with a total transaction volume of over $47 billion across 215 "tradeable futures contracts."

40.     KuCoin's quarterly delivery futures are agreements to buy or sell digital assets at a predetermined price at a specified time.  They are "contracts of sale of a commodity for future delivery" under the Act.

41.     KuCoin's perpetual futures are similar to quarterly delivery futures, except that they have no predetermined settlement time, and therefore perpetual futures contracts can be held indefinitely until the holder decides to close them, or until they are forced to liquidate due to insufficient margin.  "Perpetual futures," which are also often referred to in the digital asset industry as "perpetual swaps," "perpetual contracts," or simply "perpetuals," transfer, as between

the parties to the transaction, the financial risk associated with a future change in one or more commodities without conveying a current or direct or indirect ownership in those commodities. Perpetual futures are "swaps" under the Act.  7 U.S.C. § 1a(47); 17 C.F.R. § 1.3.  KuCoin has launched more than 60 perpetual contract products that can be margined by USDT and BTC.[2]

42.     According to KuCoin, perpetual futures are "aimed to replicate the underlying . . . spot market," meaning that the price of a perpetual future contract is designed to closely approximate the price of the underlying digital asset (so for example, the price of a BTC perpetual future would approximate the price of BTC).  Thus, a customer with a long position in a BTC perpetual future will profit if the value of BTC increases and lose money if the value of BTC decreases.  Conversely, a customer with a short position in a BTC perpetual future will lose money if the value of BTC increases and profit if the value of BTC decreases.

43.     The close correlation in price between a perpetual future and the underlying commodity is achieved through a "funding rate" mechanism.  Pursuant to this mechanism, if the price of the perpetual contract exceeds the price of the underlying asset, then long positions pay a funding rate to short positions, thereby incentivizing more short positions.  Conversely, if the price of the perpetual contract is below the price of the underlying asset, then short positions pay a funding rate to long positions, thereby incentivizing more long positions.  With respect to KuCoin's BTC perpetual swaps, the price of BTC is based on a Bitcoin Spot Index, which is an index comprised of the volume-weighted average U.S. dollar price of bitcoin on six different exchanges.

---

[2] USDT is a type of victual currency called a "stablecoin," meaning that it is supposed to be redeemable on a 1:1 based with the U.S. dollar.  USDT is also known as Tether and is largest stablecoin by market capitalization. Stablecoins function primarily as a store of value, a unit of account, and a medium of exchange for the purchase of goods and services and the purchase of other digital assets.  USDT is a commodity as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

44.     Both quarterly delivery futures and perpetual futures are bilateral agreements between KuCoin customers.  In other words, when a customer enters into a quarterly delivery future or perpetual future contract on KuCoin, the counterparty is another KuCoin customer, not the exchange itself.

45.     KuCoin's futures contracts are grouped into USDT-Margined and Coin-Margined contracts on the basis of the settlement coins.  USDT-Margined contracts, like the name suggests, take USDT as margin, are quoted in USDT, and are settled in USDT.  Coin-Margined contracts require that the customer use the underlying digital asset (for example, BTC) for margin and settlement.  During the Relevant Period, KuCoin allowed trading of BTC quarterly delivery futures with up to 20x leverage—i.e., an investment of one dollar will generate twenty dollars of exposure.  KuCoin allowed trading of perpetual futures with up to 100x leverage.

46.     KuCoin also permits leveraged, margined, or financed trading of several digital asset commodities, including BTC, ETH, and LTC, with up to 10x leverage.  Leveraged, margined, or financed trading on KuCoin allows customers to borrow funds for the purpose of entering into a comparatively large position in digital asset commodities using a comparatively small amount of funds, thereby magnifying profits and losses.  For example, a customer can create a margined long position in BTC by borrowing USDT to buy BTC; then, if the BTC spot price rises, the customer can sell BTC to repay the USDT debt.  The lenders in such transactions are typically other KuCoin customers.  Customer-lenders use the KuCoin platform to lend their assets and act in concert with KuCoin, which matches lenders and borrowers and facilitates and oversees the loans.

47.     To trade on margin, customers are first required to deposit collateral into their margin account held at KuCoin.  KuCoin customers can choose between two types of margin:

cross margin and isolated margin.  Cross margin means that all assets in the margin account, regardless of type, will be used as collateral.  Isolated margin means that each margin trading pair has its own separate margin account.  KuCoin allows 5x leverage for cross margin and 10x leverage for isolated margin.  Funds in customers' margin accounts are accepted and held in the custody of KuCoin and subject to KuCoin's control.  KuCoin monitors each customer's debt ratio—i.e., account liabilities divided by account assets.  If the debt ratio reaches 97%, KuCoin will execute a forced liquidation of the margin account and sell the assets in the account to repay the customer's liabilities.  During the Relevant Period, KuCoin customers could trade on a leveraged, margined, or financed basis regardless of whether they met the statutory definition of an "eligible contract participant," and KuCoin took no steps to ascertain whether its customers met that definition.

48.     In addition to allowing customers to engage in leveraged, margined, or financed commodity transactions in BTC, ETH, and LTC (among hundreds of other digital assets), KuCoin facilitates and allows trading of dozens of its own proprietary leveraged tokens. Leveraged tokens are digital assets with built-in leverage.  For example, KuCoin's BTC3L token seeks to mimic a 3x leveraged long position in BTC, which means that if the price of BTC increases or decreases by 1%, the net value of BTC3L will increase or decrease by 3%. Conversely, BTC3S is a token that seeks to mimic a 3x leverage short position in BTC, which means that if the price of BTC increases or decrease by 1%, the net value of BTC3S will decrease or increase by 3%.  KuCoin offers leveraged tokens based on multiple digital asset commodities, including BTC, ETH, and LTC.  During the Relevant Period, KuCoin customers could trade leveraged tokens regardless of whether they met the statutory definition of an "eligible contract participant."

49.     KuCoin describes its leveraged tokens as "unit share[s] of a leveraged fund." KuCoin is the manager of these "leveraged funds" and the creator of the leveraged tokens.  In that capacity, KuCoin finances and oversees the leverage of the fund and charges management fees that vary according to market conditions.  Customers may buy and sell KuCoin's leveraged tokens in either primary or secondary market transactions.  In primary market transactions, customers may subscribe to the leveraged fund, thereby purchasing leveraged tokens from KuCoin.  Customers may also redeem their leveraged tokens in the primary market by selling them to KuCoin.  In primary market subscriptions and redemptions, KuCoin acts as a counterparty to the customer's transactions.

50.     KuCoin reserves the right to change management fees in its sole discretion.  For example, on June 12, 2022, KuCoin announced that "[d]ue to the fluctuation in the recent market, KuCoin has adjusted the management fee of leveraged tokens to 0.3%."  As manager, KuCoin rebalances its leveraged tokens daily to ensure that the tokens achieve returns based on the agreed-upon leverage—for example, to ensure that the BTC3L token achieves a return that approximates 3x leverage.  In addition, KuCoin performs "irregular rebalancing" at its discretion when volatility of the underlying assets exceeds certain thresholds.

**B.     KuCoin Failed to Restrict U.S. Customers' Access to the Platform During the Relevant Period**

51.     During the Relevant Period, KuCoin claimed to allow customers to "Trade Anytime, Anywhere."  Consistent with this motto, KuCoin's KYC procedures during the Relevant Period were either non-existent or a sham, and U.S. customers were able to trade derivatives or trade commodities on a leveraged, margined, or financed basis on KuCoin at all times during the Relevant Period.

52.     KuCoin had no KYC procedures at all until on or around November 1, 2018, and therefore U.S. customers could trade all products available on KuCoin, including commodity interests such as derivatives and leveraged, margined, or financed commodity transactions, without restriction during that time.  U.S. customers could create a KuCoin account with only an email address or telephone number and begin using the trading platform to trade derivatives without providing any additional information.  Customers were not required to identify their country of residence, nor did KuCoin block customers based on their internet protocol ("IP") address location.  To trade on the platform, customers could fund their newly created accounts with cryptocurrencies that the customer deposited into a digital asset wallet generated by KuCoin.  Rather than verify the identity and location of its customers, KuCoin placed the onus on the customer to "undertake," simply by clicking a box at registration acknowledging the "Terms of Use," that they were permitted to access the platform in their geographic location.

53.     KuCoin recognized that it was not permitted to offer swaps, futures, or leveraged, margined, or financed retail commodity transactions to U.S. customers, and therefore its Terms of Use at times referenced restrictions on trading by U.S. persons.  But, KuCoin equivocated on how explicitly its Terms of Use purported to restrict trading by U.S. persons.  And, equally important, KuCoin failed to implement controls that would actually restrict U.S. persons from trading on the exchange.

54.     Initially, KuCoin's Terms of Use required customers to undertake that they were not "a resident of the United States" or "a company registered in the United States."  But later, KuCoin removed all specific references to the United States, such that the Terms of Use required customers to undertake only that they were not "a resident of or registered in, any of the jurisdictions that the Platform has deemed to be high risk."  Notably, however, KuCoin did not

specifically define which jurisdictions it deemed to be "high risk" and did not state that the United States was a "high risk" jurisdiction.

55.     Later still, KuCoin amended its Terms of Use during the Relevant Period to require an "undertaking" that the customer was "not a resident of or registered in, any of the Restricted Locations," which "include[d] the United States, Singapore, the mainland of China and Hong Kong, such countries sanctioned by the Republic of Seychelles and countries sanctioned by international laws and conventions to which the Republic of Seychelles is a party."

56.     KuCoin's Terms of Use, however, were ineffective in preventing U.S. persons and entities from accessing the platform because KuCoin did not implement any steps to actually identify U.S. persons and block or restrict their access to the exchange.  KuCoin did nothing to deny access to U.S. persons, who could continue to log into their accounts, deposit digital assets, and trade commodity derivatives on the platform after "acknowledging" KuCoin's evolving Terms of Use.

## C.     KuCoin's KYC Verification Was a Sham

57.     On or around November 1, 2018, and continuing to June 2023, KuCoin purported to implement a KYC verification procedure to "ensure[] that KuCoin meets the development rules of the virtual currency industry."  KuCoin acknowledged that KYC can "effectively reduce fraud, money laundering, [and] terrorist financing, amongst other malicious activities."  KuCoin implemented a tiered approach to KYC verification, in which higher tiers of KYC verification unlocked greater trading "privileges," such as higher daily withdrawal limits and greater leverage in futures trading.

58.     KuCoin "strongly suggest[ed]"—*but did not require*—that its "clients complete the KYC verification."  KuCoin classified customers who did not complete KYC verification as

"unverified" but nevertheless permitted unverified customers to trade on the platform while imposing modest, and legally insufficient, restrictions.  For example, unverified customers were limited to a withdrawal limit of one BTC per day and a maximum of 5x leverage on futures trading.  But, unverified customers, including those in the U.S., were still permitted to trade futures.  The chart below, which was published on KuCoin's website, captures the privileges available for the different verified and unverified accounts:



| | Withdrawal Limit | Fiat Trading Limit | Futures Trading Leverage |
|---|---|---|---|
| Unverified | 1 BTC in 24 hrs | 0 | Up to 5x |
| Basic Verification | 1 BTC in 24 hrs | 0 | Up to 20x |
| Advanced Verification | 200 BTC in 24 hrs | 100K USDT in 24 hrs | Up to 100x |

59.     KuCoin maintained that "KYC users in restricted countries and regions" "cannot open Futures trading."  This statement was true, but highly misleading.  If a U.S. customer submitted KYC information to KuCoin that identified the customer's location or residency as the United States, then KuCoin would not permit that customer to trade futures.  But, the submission of KYC information was *entirely voluntary*, and therefore U.S. customers could continue to trade futures simply by declining to submit KYC information.

60.     Moreover, the purported restrictions on futures trading did not apply to leveraged, margined, or financed transactions or leveraged tokens involving digital asset commodities, which remained available to trade by all customers regardless of their KYC status.

61.     KuCoin also maintained that "users with IP addresses in restricted countries and regions" "cannot open Futures trading."  But this statement was false:  although KuCoin tracked the IP addresses of its customers, it did not impose any IP address restrictions during the

Relevant Period or account for commonly used technology such as VPNs that could potentially circumvent IP address restrictions, to prevent U.S. customers from trading futures.

62.     The reason for KuCoin's reluctance to implement meaningful KYC requirements is obvious.  Anywhere from 20% to 50% of KuCoin's customers were from the United States during the Relevant Period, meaning that KuCoin stood to lose an important market and source of revenue and growth.

**D.     KuCoin Publicly Encouraged U.S. Persons to Avoid Its KYC Process**

63.     Independent or purportedly independent articles posted on KuCoin's website, which were meant to serve as testimonials to solicit customers for the platform, touted the lack of mandatory KYC as a primary feature of the platform.  For example, one article stated that, in comparison to another well-known exchange, "KuCoin wins hands down on th[e] 'KYC leniency' front."  Other articles linked to the KuCoin website observed that, in contrast to KuCoin's statements that customers in restricted countries and regions could trade on the platform, "using KuCoin if you live in the United States is a bit of a gray area."  In fact, as KuCoin well knew, trading of futures, swaps, and leveraged, margined, or financed retail commodity transactions on KuCoin by U.S. persons was not a "gray area" at all, but rather was explicitly prohibited by the CEA and Regulations.

64.     Making matters worse, KuCoin's customer support repeatedly told customers who attempted to complete KYC verification from the United States that they could continue to trade on KuCoin as an unverified customer—i.e., without submitting any KYC information at all.  Although KuCoin's customer support representatives stated that KuCoin "must adhere to relative regulation and laws to stop providing service for those customers whose KYC show that they are the citizens" of prohibited countries, KuCoin did not terminate unverified accounts with known U.S.-based trading activity or prohibit those accounts from trading commodity derivatives.

65.     Scores of U.S. customers publicly identified themselves on social media as traders on KuCoin and interacted with KuCoin customer support representatives relating to KYC verification.  In response to inquiries from customers about the ability to trade on the platform from the United States, KuCoin customer support instructed U.S. persons that "[f]or existing USA users, the accounts are not affected" and pledged to "notify [existing U.S. users of] the latest updates in advance" so the user had "enough time" to remove any assets should there be an issue trading from the United State in the future.  Customer support also instructed potential users that trading from the United States was permissible and that they could access the platform simply by declining to complete the KYC verification process.

66.     Reddit, an online forum, is replete with reports of users being able to trade futures and leveraged, margined, or financed products on KuCoin while located within the United States. In the subreddit forum "r/KuCoin," dedicated to KuCoin content, moderator accounts associated with KuCoin interacted with Reddit users and addressed specific questions, including questions related to KYC and the availability of KuCoin services in the United States.

67.     For example, in response to a question on Reddit about the use of the platform within the United States, KuCoin confirmed that the platform was available to U.S. customers without any KYC.  A KuCoin moderator on the subreddit stated:  "KYC is not supported [in the U.S.] but you can still all [sic] features of KuCoin with unverified account."  In a similar post, KuCoin wrote:

> Out of respect to the company's operational requirements, we are only providing service for countries listed in the KYC countries list (US is not included), in order to comply with all applicable laws and regulations.  If a user's country is not included in the list, unfortunately, we are temporarily unable to verify the user's KYC.  Rest assured that on KuCoin, KYC is not mandatory, you can still do transactions even if you are not verified yet.

68.     And in yet another post, KuCoin wrote:

[R]est assured that US residents can use KuCoin even KYC [sic] is not supported.
Please be noted [sic] that KYC is not mandatory here in KuCoin.  However, you'll
have some limitations for being [an] "unverified" account.

69.     These "limitations"—namely, as described above, that (1) withdrawals were
limited to 1 BTC per 24 hours (roughly equivalent to between $10,000 and $60,000 during the
Relevant Period), and (2) leverage on futures trading was limited to 5x—were minor and legally
insufficient.  Unverified U.S. customers could still trade swaps, futures, and leveraged,
margined, or financed retail transactions involving digital asset commodities.

70.     KuCoin is also active on Twitter and responded to questions from Twitter users
directed to KuCoin's official Twitter account during the Relevant Period, including questions
relating to use of KuCoin by U.S. customers.  In response to a complaint in April 2022 about
difficulties signing up from the United States, the KuCoin moderator echoed the advice provided
on Reddit for U.S. customers to avoid KYC altogether.  KuCoin stated that "KYC is not
supported to [sic] USA users, however, it is not mandatory on KuCoin to do KYC.  Usual
transactions can be done using an unverified account."

71.     In another example from April 2022, a Twitter user stated that he was "in the
United States" and asked KuCoin to tell him "why [his] KuCoin account is saying Verification
Failed after [he] used it several times two weeks ago."  KuCoin responded:  "Users from the
USA is [sic] not supported for KYC service.  Rest assured that you are not obliged to do KYC on
KuCoin."  Notwithstanding KuCoin's passing references on Twitter to complying with "all
applicable laws and regulation," KuCoin told U.S. customers that "[n]ormal transfers and trade
behaviors will not be limited" for unverified accounts.

72.     Through its monitoring of social media, KuCoin was well aware that U.S. persons continued to transact in commodity derivatives and transact on a leveraged, margined, or financed basis on the platform.  Dozens of Twitter users who self-identified as located within the U.S. tweeted at KuCoin (using KuCoin's official Twitter handle, @kukoincom) with questions, complaints, and comments about their trading of futures and leveraged, margined, or financed trading.  For example, one customer who claimed to be based in San Antonio wrote on Twitter, "@kucoincom A few hours ago I was trading futures on your mobile app when the system logged me out."  Another Twitter user who claimed to be based in California wrote, "@kucoincom isolated margin just literally made money disappear."

**E.     KuCoin Engaged in Marketing Activities Targeting U.S. Persons**

73.     KuCoin engaged in substantial marketing and solicitation activities directed to U.S. persons during the Relevant Period, including through its Affiliate Program, Global Influencer Program, contests available to U.S. customers, and sponsorship and attendance of industry conferences in the United States.

74.     KuCoin's Affiliate Program gave program participants a unique referral link. When a new customer registered an account with KuCoin using the referral link, the program participant earned trading fee commissions associated with the new customer.  KuCoin had more than 16,000 participants in the Affiliate Program, many of whom were based in the United States, solicited U.S. persons, and promoted KuCoin on U.S.-based social media platforms like Twitter and YouTube.

75.     To complement KuCoin's Affiliate Program, in July 2020, KuCoin launched the KuCoin Futures Global Influencer Program, which offered key social media influencers referral commissions of up to 40% of the trading fees generated by new customers that the influencer solicited and directed to KuCoin.  Similar to the Affiliate Program, the influencer received a

unique referral link that could be added to social media content like videos, pictures, or articles relating to KuCoin.  KuCoin approved the content created by the influencer and provided web traffic support as well as media exposure to various U.S.-based social media channels, including YouTube and Twitter.  KuCoin encouraged the influencers to "[j]ust focus on your creation" because "we will boost you up!"

76.     To bolster the Global Influencer Program, since at least August 2021, KuCoin worked with a Toronto, Canada-based marketing firm to execute an "influencer campaign" to target "English" markets, including the U.S.  The influencer campaigns included dedicated YouTube videos that KuCoin promoted on its website as "Top YouTubers."  Some of those videos were produced by U.S.-based YouTube users who admitted to trading on the platform and encouraged their followers to do the same.  In June 2022, the Ontario Securities Commission obtained a multimillion-dollar judgment against KuCoin because it operated in Ontario without properly registering.[3]

77.     In another YouTube video linked on the KuCoin website and sponsored by KuCoin, a YouTube user listed the top seven reasons to use the exchange.  The number one reason to use the platform, according to the YouTube user, was that KYC verification was optional.  The YouTube user also stated that U.S. customers were not eligible for KuCoin's KYC verification process but that U.S. customers could use the platform nevertheless.

78.     The goal of KuCoin's marketing strategy was to use global and regional social media influencers to build "hype" and create viral growth in English-speaking markets including the United States.  The Canadian marketing firm attributed the strategy of retaining "regional"

---

[3] *In re MEK Global Limited and Phoenixfin Pte. Ltd.*, 2022 ONCMT 15 (June 21, 2022), *available at* https://www.capitalmarketstribunal.ca/en/proceedings/mek-global-limited-re/reasons-and-decision-matter-mek-global-limited-and-phoenixfin-pte-ltd.

influencers, and aggressively pursuing the attention of young audiences on Instagram and TikTok with features like $25 USDT for every sign-up on the platform attributable to specific influencers, for causing Kucoin's market reach to "skyrocket."

79.     Between January and December 2022, KuCoin's trading volume across all products exceeded $3.6 trillion, representing a growth of over 52%.  At its peak in May 2022, KuCoin's daily trading volume in the futures markets (including perpetual futures, which are swaps) "soared to a high of $23 billion."  KuCoin's total number of registered customers surpassed 27 million by the end of 2022, with more than 13 million new customers registered in 2022 alone.  While KuCoin acknowledged that it tracked the location of its customers, claiming in its 2022 Annual Review that the most significant jump in its customer base came from the Asia-Pacific region, the same report was silent about the growth in the "English" markets it targeted through the Canadian-based marketing firm.

80.     KuCoin also solicited U.S. persons by attending key industry conferences.  In June 2022, KuCoin's CEO and other high-level KuCoin executives attended the Consensus 2022 conference held in Austin, Texas.  Consensus 2022 was a large-scale cryptocurrency and Web3 convention, attracting approximately 17,000 attendees, that spanned over four days with many sponsors and companies in the digital asset industry attending the event.  KuCoin had its own booth at Consensus 2022, sponsored the event, participated in numerous aspects of the event, and met with various companies.

81.     In September 2022, KuCoin also sponsored an after-party event at Mainnet Area 51, at High Bar New York located in New York City.  Mainnet 2022 is a crypto-industry summit with panels, presentations, keynote speakers, and networking events.

**F.**      **KuCoin Sought U.S.-Based Investors and Employees**

82.      KuCoin exploited U.S. capital markets and had business operations in the United States during the Relevant Period.  In 2022, KuCoin raised over $150 million in investments through a Series B round of funding, bringing total investments to $170 million when combined with a Series A funding round in 2018.  KuCoin reported that its funding amounts were based on a total valuation of $10 billion.  Four of KuCoin's seven investors have offices or headquarters in the United States.

83.      KuCoin's CEO recognized the importance of receiving funding from U.S.-based investors, stating that the funding reflected a "vote of confidence from prominent investors."  He also noted that the support of one U.S.-based investor "will solidify [KuCoin's] leading role as a centralized exchange and facilitate our ecosystem expansion in the decentralized Web 3.0 world."

84.      During its Series A funding, KuCoin openly touted its U.S. customer base, telling investors that 20% to 50% of its customers were from the United States.  However, for the Series B funding, KuCoin obscured its U.S. customer base by claiming that it had banned U.S. and Chinese customers and that other regions, such as South America, India, Vietnam, Japan, and Turkey were the top 5 regions and accounted for 50% of the customer base.  KuCoin referred to "English" customers from "North America" to avoid openly admitting that it permitted trading from the United States and that customers from the United States reflected a significant—and critical—share of KuCoin's customer base.

85.      Additionally, over 100 KuCoin employees resided in the United States during the Relevant Period.  The United States is home to the largest percentage of KuCoin's workforce, accounting for over 10% of its global workforce of about 1,000 employees in 2022.  Among

other employees, KuCoin's "Head of Futures" listed a U.S. residence during the Relevant Period, as well as numerous project managers, officers, directors, and coordinators.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT I

**Violations of Section 4(a) of the Act, 7 U.S.C. § 6(a), or, alternatively, Section 4(b) of the Act, 7 U.S.C. § 6(b) and Regulation 48.3, 17 C.F.R. 48.3 (2022)**

**Execution of Leveraged, Margined, or Financed Retail Commodity and Futures Transactions Involving Commodities on an Unregistered Board of Trade**

86.     The allegations set forth in paragraphs 1 through 85 are re-alleged and incorporated herein by reference.

87.     7 U.S.C. § 6(a) makes it unlawful for any person to offer to enter into, execute, confirm the execution of, or conduct an office or business in the United States for the purpose of soliciting, or accepting any order for, or otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery, unless such transaction is made on or subject to the rules of a board of trade that has been designated by the CFTC as a contract market (i.e., a DCM).

88.     During the Relevant Period, Defendants Mek Global, PhoenixFin, Flashdot, and Peken, acting as a common enterprise and doing business as KuCoin, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 6(a) by:

    a.   offering to enter into (i) transactions described in 7 U.S.C. § 2(c)(2)(D), or (ii) contracts for the purchase or sale of digital asset commodities for future delivery;

    b.   entering into (i) transactions described in 7 U.S.C. § 2(c)(2)(D), or (ii) contracts for the purchase or sale of digital asset commodities for future delivery;

c.  confirming the execution of (i) transactions described in 7 U.S.C. § 2(c)(2)(D), or

(ii) contracts for the purchase or sale of digital asset commodities for future delivery;

and

d.  conducting an office or business in the United States for the purpose of soliciting, or

accepting any order for, or otherwise dealing in (i) transactions described in 7 U.S.C.

§ 2(c)(2)(D), or (ii) contracts for the purchase or sale of digital asset commodities for

future delivery;

without conducting such transactions on or subject to the rules of a board of trade that was

designated by the CFTC as a contract market.

89.   In the alternative, during the Relevant Period, Defendants Mek Global,

PhoenixFin, Flashdot, and Peken, all acting as a common enterprise and doing business as

KuCoin, and through their officers, employees, and agents, violated and are continuing to violate

7 U.S.C. § 6(b) and Regulation 48.3, 17 C.F.R. § 48.3 (2022), by permitting direct access to its

electronic trading and order matching system without obtaining an Order of Registration for a

foreign board of trade from the CFTC.

90.   During the Relevant Period, KuCoin provided participants located in the United

States with direct access to the electronic trading and order matching system.

91.   KuCoin has never registered with the Commission as a foreign board of trade.

92.   Each offer to enter into, entry into, execution of, confirmation of the execution of,

and/or act of conducting an office or business in the United States relating to illegal off exchange

futures transactions and retail commodity transactions, including, without limitation, those

specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6(a) or,

alternatively, 7 U.S.C. § 6(b) and 17 C.F.R. § 48.3.

93.     The acts and omissions KuCoin's officers, employees, or agents acting for KuCoin described in this Complaint were done within the scope of their office, employment, or agency with KuCoin.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2, KuCoin is liable as a principal for each act, omission, or failure of the officers, employees, or agents acting for KuCoin.

## COUNT II

### Violation of Section 4d of the Act, 7 U.S.C. § 6d

### Engaging in Activities That Can Only Lawfully Be Performed by a Registered Futures Commission Merchant

94.     Paragraphs 1 through 85 of this Complaint are re-alleged and incorporated herein by reference.

95.     Section 1a(28) of the Act, 7 U.S.C. § 1a(28), in relevant part, defines an FCM as any individual, association, partnership, corporation, or trust that engages in (a) soliciting or in accepting orders for commodities for future delivery, swaps, or "any agreement, contract, or transaction described in . . . section (2)(c)(2)(D)(i)" and, (b) in connection therewith, "accepts any money . . . or property (or extends credit in lieu thereof) to margin . . . trades or contracts that result or may result therefrom."

96.     Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1), in pertinent part, makes it unlawful for any person to act as an FCM unless registered with the Commission as an FCM.

97.     During the Relevant Period, Defendants Mek Global, PhoenixFin, Flashdot, and Peken, all acting as a common enterprise and doing business as KuCoin, and through their officers, employees, and agents, have operated as an FCM, and are continuing to operate as an FCM, by:

   a.  engaging in soliciting or accepting orders for the purchase or sale commodities for future delivery;

   b.  engaging in soliciting or accepting orders for swaps;

   c.  engaging in soliciting or accepting orders for agreements, contracts or transactions described in Section 2(c)(2)(D)(i) of the Act (leveraged, margined, or financed retail commodity transactions);

and, in or in connection with such activities, accepting money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on KuCoin.

98.    During the Relevant Period, Defendants Mek Global, PhoenixFin, Flashdot, and Peken, all acting as a common enterprise and doing business as KuCoin, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 6d by failing to register with the Commission as an FCM.

99.    Each act in violation of 7 U.S.C. § 6d, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

100.    The acts and omissions of KuCoin's officers, employees, or agents acting for KuCoin described in this Complaint were done within the scope of their office, employment, or agency with KuCoin.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, KuCoin is liable as a principal for each act, omission, or failure of any officers, employees, or agents acting for KuCoin, constituting violations of 7 U.S.C. § 6d.

**COUNT III**

**Violations of Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1), and
Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2022)**

**Failure to Register as a Designated Contract Market or Swap Execution Facility**

101.    Paragraphs 1 through 85 of this Complaint are re-alleged and incorporated herein by reference.

102.    During the Relevant Period, Defendants Mek Global, PhoenixFin, Flashdot, and Peken, acting as a common enterprise and doing business as KuCoin, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3(a)(1) by operating a facility for the trading of swaps on digital assets that are commodities including BTC, ETH and LTC without registering with the CFTC as a DCM or a SEF.

103.    KuCoin has operated and is continuing to operate a trading system or platform in which more than one market participant has the ability to execute or trade swaps with more than one other market participant on the system or platform without being registered as a DCM or SEF.

104.    Certain products that have traded on KuCoin, including "perpetual contract products" on BTC, ETH and/or LTC are swaps as defined by 7 U.S.C. § 1a(47).

105.    Each act in violation of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

106.    The acts and omissions of KuCoin's officers, employees, or agents acting for KuCoin described in this Complaint were done within the scope of their office, employment, or agency with KuCoin.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, KuCoin is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for KuCoin, constituting violations of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3.

**COUNT IV**

**Violations of Regulation 166.3, 17 C.F.R. § 166.3 (2022)**

**Failure to Diligently Supervise**

107.     Paragraphs 1 through 85 of this Complaint are re-alleged and incorporated herein by reference.

108.     During the Relevant Period, Defendants Mek Global, PhoenixFin, Flashdot, and Peken, acting as a common enterprise and doing business as KuCoin, and through their officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 166.3 by employing an inadequate supervisory system and failing to perform its supervisory duties diligently.  More specifically, KuCoin violated and is continuing to violate 17 C.F.R. § 166.3 by, among other things, failing to implement an effective Customer Identification Program, failing to implement effective Know-Your-Customer procedures, failing to implement Anti-Money Laundering procedures, and failing to ensure that its partners, officers, employees, and agents, lawfully and appropriately handled all commodity interest accounts at KuCoin.

109.     KuCoin is and has been acting as an FCM, and therefore 17 C.F.R. § 166.3 applies to KuCoin, as if it were a Commission registrant.

110.     Each act in violation of 17 C.F.R. § 166.3, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation.

111.     The acts and omissions of KuCoin's and other officers, employees, or agents acting for KuCoin described in this Complaint were done within the scope of their office, employment, or agency with KuCoin.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, KuCoin is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for KuCoin, constituting violations of 17 C.F.R. § 166.3.

**COUNT V**

**Violations of Regulation 42.2, 17 C.F.R. § 42.2 (2022)**

**Failure to Implement Customer Identification Program, and Failure to Implement Know Your Customer and Anti-Money Laundering Procedures**

112.     Paragraphs 1 through 85 of this Complaint are re-alleged and incorporated herein by reference.

113.     During the Relevant Period, Defendants Mek Global, PhoenixFin, Flashdot, and Peken, acting as a common enterprise and doing business as KuCoin, and through their officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 42.2 by failing to implement a Customer Identification Program, failing to implement Know-Your-Customer policies and procedures, failing to implement an Anti-Money Laundering program, failing to obtain and retain required customer identification, and failing to implement procedures to determine whether a customer appears on lists of known or suspected terrorists or terrorist organizations such as those issued by OFAC.

114.     Each act in violation of 17 C.F.R. § 42.2, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation.

115.     The acts and omissions of KuCoin's officers, employees, or agents acting for KuCoin described in this Complaint were done within the scope of their office, employment, or agency with KuCoin.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, KuCoin is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for KuCoin, constituting violations of 17 C.F.R. § 42.2.

## VII.   RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l, and pursuant to the Court's own equitable powers, enter:

A.    An order finding that Defendants Mek Global, PhoenixFin, Flashdot, and Peken, collectively doing business as KuCoin, and through their officers, employees, and agents, violated Section 4(a) of the Act, 7 U.S.C. § 6(a) (or, in the alternative, Section 4(b) of the Act, 7 U.S.C. § 6(b), and Regulation 48.3, 17 C.F.R. 48.3 (2022)); Section 4d of the Act, 7 U.S.C. § 6d; Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2022); Regulation 166.3, 17 C.F.R. § 166.3 (2022); and Regulation 42.2, 17 C.F.R. § 42.2 (2022).

B.    An order of permanent injunction prohibiting Defendants and any other person or entity associated with them, from engaging in conduct described above, in violation of 7 U.S.C. §§ 6, 6d, and 7b-3(1), and 17 C.F.R. §§ 37.3(a)(1), 42.2, 48.3 and 166.3.

C.    An order of permanent injunction prohibiting Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert or participation with Defendants, from directly or indirectly:

> (i)    trading on or subject to the rules of any registered entity (as that term is defined in Section la of the Act, 7 U.S.C. § la(40));
>
> (ii)    entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2022)) and/or digital asset commodities as defined herein, for Defendants' own accounts or for any account in which they have a direct or indirect interest;
>
> (iii)    having any commodity interests and/or digital asset commodities as defined herein traded on Defendants' behalf;

(iv) controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests and/or digital asset commodities as defined herein;

(v) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests and/or digital asset commodities as defined herein;

(vi) applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and

(vii) acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

D. An order directing Defendants and any successors thereof, to withdraw or remove any and all websites that offer to enter into, enter into, execute, or confirm the execution of any transaction described in Section 2(c)(2)(D) of the Act that does not fall within the exceptions of Sections 2(c)(2)(D)(ii), any swap defined under Section 1a(47) of the Act, or any contract for the purchase or sale of a commodity for future delivery with U.S. customers;

E. An order directing Defendants and any third party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, loans, or fees derived, directly or indirectly, from acts or practices which constitute violations of the Act as

described herein, including pre-judgment and post-judgment interest;

F.     An order directing Defendants and any successors thereof, to rescind, pursuant to

such procedures as the Court may order, all contracts and agreements, whether implied or

express, entered into between, with, or among Defendants and any customer or investor whose

funds were received by Defendants as a result of the acts and practices that constituted violations

of the Act, as described herein;

G.     An order requiring Defendants to make full restitution by making whole each and

every customer or investor whose funds were received or utilized by them in violation of the

provisions of the Act as described herein, including pre-judgment interest;

H.     An order directing Defendants to pay civil monetary penalties, to be assessed by the

Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act,

7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation

Adjustment Act Improvements Act of 2015, Pub. L. 114–74, tit. VII, § 701, 129 Stat. 584, 599-

600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act, as described

herein;

I.     An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2412(a)(2); and

J.     Such other and further relief as the Court deems proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial on all triable issues.

Dated:  March 26, 2024                                     Respectfully submitted,

**ATTORNEYS FOR PLAINTIFF**

**COMMODITY FUTURES
TRADING COMMISSION**

Manal M. Sultan
Deputy Director
Commodity Futures Trading Commission
Division of Enforcement

By: */s/      John C. Murphy*
Andrew J. Rodgers, Trial Attorney
John C. Murphy, Trial Attorney
K. Brent Tomer, Chief Trial Attorney

COMMODITY FUTURES
TRADING COMMISSION
Ted Weiss Federal Office Building
290 Broadway, Suite 600
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9938
ktomer@cftc.gov
jmuphyr@cftc.gov
arodgers@cftc.gov